May it please the court, Sasha Petrova for Appellant Central, Oregon Wild Horse Coalition, Gail Hunt and Melinda Kessler. And I would like to reserve five minutes of my time for rebuttal, please. The issue in this case is whether the U.S. Forest Service has complied with its legal obligations under the Wild Free Roaming Horses and Burros Act, the Act, and NEPA when issuing a herd management plan that set a new appropriate management level that will be used to remove nearly two-thirds of the herd currently existing in the Big Summit Territory and used to manage that territory in the years to come. Appellants asked this court to conclude that the agency did not comply with its legal obligations and direct the district court to vacate the unlawful decision. I'll start first with the Act. So the most relevant provisions of the Act are Sections 1331 and 1333. So the Act generally requires the Forest Service to manage and protect wild horses. The Act requires that management of these horses be at a minimum feasible level. The management is, of course, accomplished by setting appropriate management levels, which must be set in consultation with federal and state agencies, as well as individuals that are deemed to have specific knowledge of wild horse protection and wild horse management. Decisions as to over populations must be made on the basis of all available information. So the biggest issue in this case is that appellants, the data submitted by appellants for the winter range was not considered by the Forest Service. And so in doing so, the Forest Service violated the mandate that requires that all information currently available be considered when setting the AML. So the AML, as explained in the briefing, was set based on approximately 19 percent of the entire territory, a very small portion. Now, the winter range that was used to determine the AML was at the very heart of the Forest Service's decision. It impacted both the first and second levels at which the Forest Service used to set the AML. Now, while appellants dispute that the propriety of using such a winter range at all in this case, at the very minimum, the Forest Service determination as to the winter range was, because it was critical to the entire decision, should have considered all available information. So it's an interesting case. There's a lot of, you know, a number that's fairly close to the AML. They said here it overlaps, if I recall correctly. I think it's 47 to 50 something now, and it was 55 to 65 then. So your challenge is really, and I think your thing is, no, they need to have three times as many horses, basically, which is what the current herd is. So the current AML is not that different than, the bigger thing is it seems like they plan to do something about it. That seems to be the real issue. And, you know, they did set a new AML, but it's very close to the old one. So do you think that when they set the AML, in other words, what I'm getting at is that, as a judge looking at this, it doesn't look like they've really changed a whole lot. And your argument is that, you know, they did all this stuff wrong, but if so, they've been doing it wrong. It's not like they had a massive change in what they've been, other than that they, it sounds like they may start actually enforcing it and try to reduce the herd too. So what do we do with the, is it your position that when they set the number at 55 to 65 in 1975, that was just grossly wrong then? And it should have been multiples higher or what? Yes, your honor. So part of the issue is, yes, that in 1975, it is not entirely clear that the AML set then reflected accurately the population of the big summit territory. Now, of course, the time to challenge that decision, the AML has long passed. And so the old AML set in... AML is long what? Past? The time to challenge the 1975 decision has long passed, of course. And the first AML was 55 to 65. The new one is 47 to 57. So there is a bit of a difference, but really what this illustrates though, is that the AML that is set by this agency, it continues to be used for decades and decades of time. But... What it wasn't though, I mean, I guess that's what's interesting about this case is, you know, and I've got a little familiarity with this, being a judge in Nevada and having, you know, Nevada's got way more horses, I think, than Oregon, wild horses. So that's an issue in Nevada, from the state's perspective, at least, is that there's these AMLs and then there's the actual number of horses. And it just seems like there's a lot of times of... And that sounds like what's been going on here is that there was a number set, 55 to 65. But as I understand from reading the briefing, that number has not really been adhered to very much. And that seems to actually kind of almost be the gist of your... Or the central aspect of your challenge really is, no, they're now saying they want to actually stick to a number like that. Is that correct? That's my perception of this? Putting aside all of the, is this number justified? And I understand that's... For you to prevail, you have to... But it's not really... It doesn't seem like a big change from what the number has been. It just may be a change from what the practice has been. Does that sound right? So our challenge is a little bit more nuanced than that. So the horse population is approximately two times the old AML under the 1975 plan. So it's about 135 in 2018. Now, the issue here that's really significant is that the population has been significantly higher. And in order to... By committing itself to recalculate this AML, the agency is required to follow the law, which is to consider all evidence and the current conditions on the range. And part of the issue here is that the range has sustained a much higher population. And our position is that it has done so because that's the type of population that this range can actually sustain. And so it is significant that there are... It is a current overpopulation, but it does not detract from the argument that the agency should be considering all the most relevant, most current information. Our position would be that it bolsters the importance of considering the current conditions once the agency has committed. Yeah, one argument would be, well, they've been living with all these horses for half a century, a number that's higher than... They have the number on paper, but then they have the number in real life. And the number in real life has been higher. And this is what I guess you were going to get at. The agency's view is that, no, we did studies and they're messing up all the riparian areas and all that. And your position is that they're not, actually. The evidence doesn't support that. Our position is that the agency has acted arbitrarily and capriciously in selecting which studies and which portions of which studies they will look at while ignoring the actual recommendations in some of the studies by their own experts. That's a really hard case for you guys to win. I mean, as somebody who used to pick the wrong study, et cetera. So that's a challenge. It's not necessarily that they picked the wrong study. So part of the biggest issue, I would say, is the actual data that was presented to the agency and not considered about where the horses are. What was not considered? So as explained in the briefing, so the appellant personally hand-delivered and met with the Forest Service to provide extensive data, much more extensive data collected by aerial flights, snowshoes, snowmobiles. I thought that they concluded that the data was incomplete and would need to be supplemented to be usable and that that didn't happen. Am I wrong? So it's a little, again, more nuanced than that. So the initial, so in response to, so let me back up. First of all, it's important to note that the agency solicited this information directly from these individuals. These are not just disinterested comments that are being submitted. These are people who worked for the Forest Service, who are integrally involved in doing the study, the counts of horses that are used to set the AML. So it's these individuals who have been asked to provide this data, who did in fact submit data. And in response to that initial submission and meeting, what we have in the record is a letter from the Forest Service saying, hey, we would like you to provide additional information, sort the data by year, provide GPS coordinates, and let us know if it's actual horse sightings or just horse trails or evidence of horse sightings. Now, on the first point, that seems to be something that was not required of other data from other folks who were asked to provide information about the winter range. The other evidence in the record does not show that... But was it provided? I'm sorry. Was it provided? The clarification by the appellants? Yeah. It was, we responded by saying we have that information, that it is available, and that we will make it available. The only reason that we didn't send it is because... Now, the government's brief, that's what you said in your brief. The government's brief, and I don't know who's right, but they said that you may have said that, but you also, there's something that you said that made it seem like it would be very difficult to provide that information. There was something about the airplane, the data from the airplane would be difficult to desegregate or something like that. I remember the government responded to that, and it made it sound like your characterization of your response, and maybe we need to hear from the government on that, but was the government wrong in how they characterized your response slightly differently or not? I'm not entirely sure which portion Your Honor's referring to, but I will take a look and address in rebuttal, certainly. The fact is that the data exists, and not to take things out there, I've seen it. It is there, and... But you didn't give it to them. If they tell you, we have this information, and it's good as far as it goes, but we need more detail in order to be able to really assess it, and then you don't give it to them, how is it arbitrary and capricious to then say we're not going to rely on that because we didn't get what we asked for? It's arbitrary and capricious because here the obligation is not on the appellants to establish an AML based on the existence of all currently available information, or information known by the agency to be available. But they actually had two studies that they primarily relied on defining the winter range, and your position is that, well, actually the winter range was larger, and we have this data, and then you supply the data, and then they say, well, it's not specific enough because this is missing, that's missing, and can we have more detail, and then we can assess it, and then you don't give it. How can it be arbitrary and capricious to say, well, we'll set aside the incomplete data, and we'll rely on what we have, and then go forward? So part of the issue is that the data was not incomplete. It was perhaps overcomplete because it included a year that was not an above average snowfall year, one year out of three. So two of the years were above average snowfall years, and one was an extra year. And that data... So I found that... Oh, yeah. Yeah, right. And they were trying to get you to break it out, take the one year out, and just have the two years. But it sounds like the government said that one of the plaintiffs emailed back saying that her small GPS, which I think is from the airplane, she said she could bring it in, but she said that her aviation GPS, this is on page 38 of the government, has all my wildlife GPS points from my flights in Alaska and Canada, and she was, quote, not willing to take the chance of losing the information or something happening to my equipment. So if somebody said that to me, I'd be like, well, I don't know if you're going to bring it in or not, but it sounds like you may not be willing to bring it. I do think that what that is intended to communicate is that this is an expensive, important piece of equipment that we're not willing to part with necessarily, maybe by mail or something like that. But in order to pull that information, there's nothing in that communication that suggests that the data is not able to be pulled from that device, which includes... No, it suggests that you may not be willing to provide it because you take the chance. And I think the last line of that communication, I will find it again for rebuttal, the last line of that communication says, we are able to provide the breakdown of this data by year. Please let us know if that is sufficient. So our last line of that response was saying, we have it, we can provide it, let us know if that works for you, the Forest Service. And there is case law from the circuit, especially that failure to... The agency cannot move its obligation to base a decision based on all available data, again, data that contradicts... So you said, we have it, if you want it, let us know, right? So you said that, and they never followed up. Correct. You want to save time for rebuttal? I do. I've reserved five minutes, I believe. You've chewed into it. Oh, okay. Sorry. Yes, I would like to. Thank you. Thank you. All right. So we'll hear now from Mr. Stockman. May it please the court. My name is Robert Stockman here on behalf of the US Forest Service. I'd like to start by addressing the issues that came up in the opening. First, this is a small change in the overall goal and management direction. And I would like to clarify one factually. It's a small theoretical change, but is it true that it would be, as a practical matter, if you actually did it, it would be significant because you'd be getting rid of half of the actual horses on the ground. It would not be significant, but it would be removing a large number of wolves, about 78 horses. But I would like to clarify something that I think may have been misunderstood from the record, which is that the Forest Service did generally to the original goal until 2011. So it's not the situation where the Forest Service wasn't managing towards that original goal. Maybe I misunderstood that. So up until 2011, they were keeping the horse population roughly in line with the 1975? Roughly in line. Okay. Yes, Your Honor. And then there was a challenge because, of course, there are legal requirements with how you deal with the gathered horses. And for a period of time, the Forest Service was limited in its ability to gather. And it's currently working through all of that even now. It's developed a new adoption facility, which is under construction. So there was a period in which they, for a long period, they enforced or generally enforced the original goals. And then there was this period where they couldn't, and the horse population grew. And they reasonably stepped back and said, let's look at the whole situation. There's been decades of new science, changed conditions on the forest. Let's reasonably consider the information we have available and determine how to manage. And they reached an appropriate management level. Well, but here's the thing. Under the Wild Horses Act, you're required to look at all information currently available to you. So I actually... Incorrect? No, that's not correct, Your Honor. Okay. And I want to say several things about that. First, I don't think this was raised in their opening brief. And it's important, because they take that phrase out of Section 13133b, I think it's 2. And the problem is, read in context, that's not... It's sort of inverting the whole purpose of that section, right? That section says, when the secretary determines there's an excess, it should act. And he can do so, or she can do so, based on any number of information. And then it says, or in the absence of that information, such information as is available. So I guess what I'd say is, it's a directive to use available information, but it isn't... If anything, as the D.C. Circuit interpreted in Watt back in the 80s, which we cite in our brief, it's a sign that the secretary can act on incomplete information, right? It's use this, use this, use this, or use what's available. So it's not, I think... How did you use the other things listed in 1 through 4? Well, we used a NEPA analysis, and we used the inventory that we have maintained of the horses, right? I mean, we've done census of the horses each year, and that's the inventory described. So first, I just think that provision's irrelevant here. But I also think, factually, there's an important distinction, which is that we don't deny that we had a comment process. We had to consider information prepared to us. I just think it changes what the duty is here, right? And I think that email is a bit of a distraction. It was sent in 2017. We don't know what happened in response to that. There was then a comment period. Well, we know what happened. There was no response from the agency. Is that fair? We don't know if it was received by the agency. Oh, so the email would have been sent saying, we have the data. If you want it, let us know. What you're saying is that the agency never received that? We don't know because, and here's the follow-up, Your Honor. They didn't bring this to our attention. They attached it to their objection like two or three years later. It's been forwarded multiple times. There's no two-line. It might have gotten caught in a spam filter. It might have been accidentally deleted. We just don't know. I'm not saying they didn't send it. We're I think that's in some ways a distraction because that was early in the process. Can I follow up on that? But I thought that at some point there was a response from the government saying, okay, so when did that happen then? Yes. So they submitted the map early in the process. And we did consider the map, which is a bunch of dots on a map. And then we did a draft environmental assessment. We said usable data supported the winter range we developed. Some data wasn't usable. This map wasn't usable because it doesn't differentiate by year. So we can't tell whether these were during above or below snow year averages. And that's really important because if all the dots that are just all over that map, if the ones that are anomalous, which a lot of them are, are from the low snow year, that could be a complete explanation and mean it just doesn't tell us anything. We also said we don't have other data point information. And they had a comment period then and never submitted it. They had an objection period. These plaintiffs have submitted hundreds of pages to the agency. The agency considered them all. All post not using the map and saying this. And they've never submitted it. So I don't, they, apparently they have it, but they've never submitted it. And I think this is an important distinction because these preliminary processes agencies have where we reach out to interested parties. So they had an opportunity to submit that information since that email went out. And that never happened. Never provided it. Never happened. It's never happened, Your Honor. And, and I think, I think this is important because these preliminary discussions, it's a way for agencies to be informal and responsive for people to shape the decision making process early. But everyone knows that the comment period is really crucial. And you have to submit your materials in the comment period, right? I've been on both sides of the V here. You have to submit the data you want considered in the comment period. That's how you make sure it formally gets into the record and the agency considers it. And, and this case I think highlights the challenges to an alternative approach because it can't be that APA review, a whole decision that's taken years and had tons of formal processes can get reversed because an email was missed, right? Imagine, imagine he just missed it. I, I don't know. But the point is that can't be how it works. It would, it would dry. It would, it would make it an unworkable system. So they never submitted that information. We, the main reason we didn't use it is the non-differentiation by years. There was also the problem of not having other GPS data, but, but I would also like to say it's not clear we would have relied on it even if they had provided all that because it is inconsistent with all the other information before the agency. And this gets to another thing, which is I think the agency does have an obligation to consider information submitted, consider the map. It does not have an obligation to give it weight or to say it outweighs other information. And this is often going to be the case because information will be in tension, right? Different people will submit different materials. Here we had two formal censuses run by the government, but with plaintiffs assisting there, we appreciate all the work this group does and these individuals do to observe and tell us about these horses. And those showed, generally showed that horses were never above 4,600 feet in high snow years. Other sources of information support that. I mean, there are places on this forest where in a high snow year, the depth of snow will be 10 feet or deeper. Horses are not foraging in snow 10 feet or deeper. That can't happen. So their map, they suggest, means there could be forage from all over the territory, but that just is not reconcilable with all the other sources of data. So even if they had submitted it, we don't know that it would have changed it. But the key problem was that we didn't even have the year data. So it may well be that the anomalous data is just a low snow year. We don't know. And they had the opportunity, multiple opportunities to submit it. So for that reason, the agency was reasonable in not relying on that map. It looked at a lot of materials to make this determination. And it's important, this is an area where technical decisions and the weighing of information, making factual judgments, is within the agency's discretion. And the agency did a lot of work here to get it right. Can I ask you, where are things now? Because you came up with this decision. It wasn't enjoined or anything by the lower court. But it doesn't sound like you've started removing horses. So is the agency just on its own volition, not going forward with a plan yet until they get a decision? The service is constructing a new adoption facility for these horses, right, to hold the horses for adoption. And the NEPA's done on that. It's begun. Our hope is to begin gathers soon. But we have not begun the formal gathers of a larger number of horses. I know sometimes there's a gather of a single horse in certain circumstances, I think, but that's not. So there are reasons we haven't begun it. And the other part of the plan was to possibly bring in another mare or something from outside. Have you done? And I know you did that years ago, but have you done that? I don't know if that's been done. I haven't double-checked that, Your Honor. But yes, the goal is to bring in small numbers of mares to add to the genetic diversity. And we had a lot of expert support for that. I mean, and this gets to, I think, the NEPA question, which is that ultimately we found this wasn't a significant environmental impact. The herd will be healthier genetically in light of the new herd management plan. The horses, because there will be adequate forage for them, will be in healthier conditions. It will be a smaller number of horses. There will be environmental benefits. I mean, one of the goals here is to restore riparian management areas. We did a lot of research, and there are a lot of riparian areas in this territory that are unsatisfactory and poor condition. And there's a lot of evidence that horses are not the only cause. I mean, lots of things, sheep, but also is not sustainable with an acceptable level of riparian, balancing it with the other ecological needs of the forest. There are no further questions? Thank you very much. We ask this Court to affirm. All right. Thank you. We'll hear rebuttal now. Thank you. Just a couple more points in response. So first, I want to point the Court to ER-199, which shows the winter range map that was used by the Forest Service, which is not even consistent with the data that it did consider. It has multiple, I believe 11 or so points that are outside the winter range. And this is based on the data the Forest Service did consider. So even that itself is arbitrary. ER-257 is where the Court can find... I recall their answer to that was that those are siding. So it doesn't necessarily indicate that that's a place where the horses are grazing, I guess, for lack of a better word, a forage area. Sure. But if the purpose of the winter range is to determine where the horses are during wintertime, it should be... We should actually use data that reflects where the horses are rather than... I'm sure that makes... I'm sorry, I don't want to... I'm sure that makes sense because, as I recall, they picked a winter range and they basically figure out how much food is there, they break it down. And so I thought that the purpose of picking a winter range was to take... to figure out how much food was available. Generally, ultimately, yes. So, sure, there are 11 points. Just to put that out there, it did not consider adequately where horses are. And horses do forage for a majority of the day. So that area, our contention, should have been considered anyway. But more importantly, SER-249 is where we have the definitive statement of, we can provide you the data, let us know. Now, the... So... What is your response to the state? We have... But that happened before the comment period. Why didn't you just provide the data during the comment period? Are they correct that the comment period was after and that you did not provide it during that time? They are correct that the data was not provided. But the comments respond saying, we had the data and it should have been considered. And so, again, the obligation is not on an organization, a non-profit, to consider the data. So, first of all, the EA does... But if the statute says that they're supposed to consider all available information, which they did, they didn't consider the information you had because you never gave it to them. So they technically are consistent with the statute, though. So they did not consider the available information because the map was provided. So there is no dispute. And I believe that's ER-257. It's in the... Well, but the year information, the year data is not there. And you can see that that was... So, yes, there's an additional year that is... So it's over-inclusive. But out of the 133 points, I believe, there was only a small fraction, I believe 30-something that were within the actual winter range. So even if you conceivably, there was an over-inclusion of data, it is more likely than not that the majority of the horse sightings were outside the winter range. So from that alone, it should have triggered an obligation for the agency to follow up, make sure that they were, in fact, relying on the best available information. I see where I am out of time. Thank you. Thank you, counsel. The case just argued will be submitted. And that concludes our session for this morning. And with that, we are in recess.
judges: COLLINS, VANDYKE, MENDOZA